## Pennsylvania Milk Control Commission v. Nicoson

*Fisher & Ruddock*, for appellant.

*William F. Schutte*, Deputy Attorney General, *Henry M. Bruner*, Chief Counsel of the Milk Control Commission, and *Edwin M. Clark*, for commission.

CREPS, P. J., April 8, 1946.—This matter is before the court on appeal of defendant from an order of the Milk Control Commission of the Commonwealth

of Pennsylvania. The record presented is most unsatisfactory for the purposes of an intelligent review. Of the 59 pages of testimony, well over half of them are taken up by objections, (particularly on the part of double counsel for the commission), rulings, statements, colloquies between opposing counsel and between counsel and the hearing commissioner. As a result of these persistent interjections and interpolations, the normal sequence has been practically destroyed and it is most difficult to properly appraise the value of the testimony that is in the record. However, we can only deal with the matter as it is thus presented.

The proceeding began by the issuance by the commission of a citation, amended as of September 27, 1945, upon defendant to show cause why said commission should not revoke his milk dealer's license no. 1205 granted for the year May 1, 1945, to April 30, 1946, inclusive, and should not suspend or revoke the right of said dealer to apply for a milk dealer's license for the year May 1, 1946, to April 30, 1947, inclusive, because of alleged violations of the law and the rules, regulations and orders of the commission, particularly charging defendant with failure to account and make payment for milk purchased and received from producers during the period of May 1, 1945, to and including August 31, 1945, in accordance with the official general orders of the commission, resulting in an alleged aggregate underpayment of $593.79.

Following a hearing, the commission, as of October 30, 1945, filed its "findings of fact, discussion, conclusion (and) order of the commission", whereby defendant's license and right to apply for a renewal thereof were revoked in accordance with the terms of the citation, to be effective in 30 days from the date thereof. In the "discussion" it is stated that "If during said 30-day period defendant pays the above-mentioned underpayments to the producers to whom

the same is due, this commission will consider allowing him to again engage in the milk business". Defendant's "specifications of objections" contain 40 specific exceptions in all of which it is asserted that the particular "action, decision and order" of the commission involved is "unjust, unlawful and confiscatory" and many averring that the commission's action is in violation of the due process clause of the Constitution of the United States and contrary to the eleventh section of article I of the Constitution of Pennsylvania.

Admittedly, defendant has owned and operated the Marion Center Creamery since October of 1924. The physical plant consists of a receiving and processing station in the Borough of Marion Center, Indiana County, Pa., and a principal office and distribution center in the Borough of Indiana, Pa., some 15 miles distant from Marion Center. The producers of milk handled by defendant are farmers in the vicinity of Marion Center. After milk is received and processed at the receiving station, it is then hauled by defendant's trucks to the place of distribution and marketing in Indiana, a borough with a population of around 10,000 people. Defendant is one of the two largest milk dealers in the Borough of Indiana.

Since the enactment of the Milk Control Law in Pennsylvania, prices of milk are fixed by general orders of the commission. From time to time such price-fixing orders have taken into consideration the factor of transportation in determining the prices to be paid to milk producers. At least one of the basic points of difference between the parties arises in this connection. The contention of the commission in this regard is disclosed in the following quotation from its brief: "Reasonable hauling charges are allowed by the Milk Control Commission from the farm to the dealer's plant, but not between the dealer's plants". Defendant, on the contrary, avers that over the course

of years the commission, recognizing the unusual situation of defendant, that of having his receiving and processing station at one location and the market for milk at a point 15 miles distant, has allowed a deduction from the price paid to producers to cover this transportation cost. In order to explain the method whereby the commission determined the amount of the alleged underpayment by defendant to milk producers, it is necessary to here quote an agreement between defendant and said milk producers, disclosed in the record of the proceedings:

"ARTICLE OF AGREEMENT
BETWEEN W. M. Nicoson, trading as the Marion Center Creamery Company, of the first part

a

n

d

The undersigned Milk Producers, of the second part.

NOW THIS AGREEMENT WITNESSETH, that the parties of the second part in consideration of each being furnished by the party of the first part skim milk when available in proportion to the amount of milk each delivers to him, do hereby agree that there shall be a deduction of fifteen (15) cents per hundred weight of milk so delivered by them; and the party of the first part in consideration of said deduction does hereby agree to furnish skim milk to each of the parties of the second part when available in proportion to the amount of milk delivered by each.

THIS AGREEMENT is in force and effect as of May 1, 1945. It may be cancelled upon thirty (30) days notice to the other party or parties hereto by party of the first part or by majority of the parties of the second part."

(Signed by party of first part and twenty-one milk producers).

The commission in its "findings of fact" and/or "discussion" (they are not precisely differentiated) found and determined, inter alia:

". . . Commission is of the opinion that this purported agreement is in violation of Section 807 of the Milk Control Law of April 28, 1937, P. L. 417, as amended . . . as a method or device for the purpose of buying milk at a price less than the minimum price applicable to the particular transaction by a discount or rebate . . . Article of Agreement provides for 'a deduction of fifteen (15) cents per hundred weight of milk so delivered,' which clearly makes it an arbitrary deduction of the minimum price provided by the Official General Order of this Commission". (Page 4 of the "Discussion" of Commission Report).

". . . defendant milk dealer failed to account and make payment for milk purchased and received from milk producers during the period of May 1, 1945, to and including August 31, 1945, in accordance with Official General Orders . . . resulting in under-payments to said milk producers for said period in the amount of $593.79".

For purposes of its calculations, the commission adopted the figures of its auditor as to the amount of skim milk returned to producers for the period in question and made an allowance at the rate of 40 cents per hundredweight of skim milk so returned, resulting in the alleged underpayment of $593.79, allocated amongst 21 producers who had signed the above-mentioned agreement. It is admitted that, giving defendant credit for skim milk at the rate of 15 cents per hundredweight of "milk so delivered by them", he had paid the producers in full. It is here well to point out that the skim milk in question was for the purposes of animal feed, a classification as to which, admittedly, the commission had assumed no control by general

orders and had not thereby fixed any price; and a further observation should be made that the price used by the commission to arrive at its order of underpayment was merely the opinion of a witness called and accepted as an expert.

In defense to this citation, defendant contended that he had always acted in good faith with the Milk Control Commission and that deductions to cover the transportation or handling charges were made with the approval of the commission. Defendant asserts that beginning as early as 1934 and continuing through the years until the present citation issued, he had been permitted to make a deduction for hauling charges first at the rate of 30 cents per hundredweight, later reduced to 25 cents—facts plainly apparent in his records at the making of regular audits by the commission's representatives—and that his bonds were regularly surrendered to him by the commission. On May 22, 1945, by letter bearing the letterhead of the Milk Control Commission and signed by Glenn R. Spangler, Director, Bureau of Enforcement, defendant was thus informed:

"The Milk Control Commission has on this date reviewed the examinations of your records to and including December 31, 1944 and have directed this Bureau to formally notify you that beginning April 16, 1945 the deduction of 25¢ per hundredweight on Class 1 milk, transported between Marion Center and Indiana, shall be considered an illegal deduction, *thereby cancelling their permit to make an allowance of 25¢ per hundred in accordance with the Commission's letter of May 14, 1943.* The cancellation of this *permit* is in accordance with Order No. A-153 effective in your area April 16, 1945." (Italics supplied.)

Said letter was received in evidence as defendant's Exhibit no. 4. Particular notice should be taken of

the fact that the letter expressly recognized the existence of a "permit" to make a transportation charge of 25¢ per hundredweight "in accordance with the Commission's letter of May 14, 1943"; and further, that the same commission which granted the admitted "permit" declared it ineffective as of a date 36 days earlier than the date of notice of such cancellation. Defendant then offered in evidence as his Exhibit no. 3 the letter of May 14, 1943, on the letterhead of the Milk Control Commission and signed by "John M. McKee, Chairman, Milk Control Commission" (and being the letter mentioned in defendant's Exhibit no. 4), doubtless for the dual purpose of confirming his contention that he had operated in a manner approved by the commission and to show that the "permit may be cancelled or modified on *thirty days' notice* if changed conditions or further information render such action justified in the opinion of the Milk Control Commission". What took place in connection with the offer of this Exhibit no. 3 and its rejection serves to disclose what we believe to be the erroneous and untenable position generally apparent in the record before us. Counsel for the commission objected to the offer for the following reasons:

1st. That the letter being dated May 14, 1943, "there is nothing to show that it is applicable during the period of May 1, 1945 to and including August 31, 1945, the period set forth in the citation";

2nd. ". . . the letter does not show on its face that it is the action of the majority of the Milk Control Commission".

The hearing commissioner then stated, inter alia:

"I will sustain the objection. Nowhere can the sitting commission find that any action was taken by the Commission in this matter at all". . . . "The Commission has made a rule—ruled out the respondent's

Exhibit No. 3, which was a letter signed by the former Chairman of this Commission, purporting to give Mr. Nicoson a privilege of deducting 25¢ per cwt. hauling. Nowhere can I find in the minutes of the Commission, that the majority of the Commission authorized such deductions and while I regret such action, nevertheless it is not relevant to this case at all".

Again, the brief filed in this case on behalf of the commission contains this statement: "As to the illegality of John M. McKee issuing such permit we will refer the court to . . .."

To analyze briefly, defendant's Exhibit no. 3 should have been admitted because it does show that a permit allowing for transportation had been granted and that defendant had a right to rely on such permit unless and until it was cancelled in keeping with the expressed terms of the commission, namely, on 30 days' notice.

The record disclosures as to defendant's Exhibits nos. 3 and 4 seem to indicate the position of the commission and its counsel to be substantially as follows: A letter or notice signed by even a representative of the commission (as for instance defendant's Exhibit no. 4), directing a required course of action by a citizen subject to commission control, must be recognized as authoritative; but, on the other hand, a letter or notice signed by the chairman of the commission (as defendant's Exhibit no. 3), may not be relied upon by that citizen to show compliance with the orders of the commission and, when attempted to be so used, the commission will reject its own authoritative direction. If such an unsustainable position was taken by the hearing commissioner and his counsel through mistake, it is unfortunate, but nonetheless erroneous; if that position was adopted intentionally, it is still erroneous, and might well be described as capricious.

Defendant testified that on receipt of the cancellation notice (defendant's Exhibit no. 4), he promptly called the commission and had a telephone conversation with Commissioner Cobb from which he understood that it would be satisfactory with the commission if he made a direct charge for transportation rather than a deduction from the producer's price for Class 1 milk; that he thereupon adopted that practice, showing the charge on his reports to the commission, and around July, 1945, received a postal card from a Mr. Pfautz, a representative of the commission, asking for information concerning the deduction for transportation; that he then went to Harrisburg and discussed the matter with Commissioners Cobb and Snyder, being then informed that he would not be allowed a transportation charge from Marion Center to Indiana, at which conference the subject of defendant's selling skim milk to his producers was discussed, and defendant left with the understanding that "if an affable agreement (concerning sale of skim milk) between myself and producers was arrived at it would be satisfactory with the commission"; that on his return home he called a meeting of the producers, explaining the situation, and thereupon the agreement (hereinabove quoted and identified as defendant's Exhibit no. 1) as to skim milk was entered into between defendant and the producers involved; that on the next visit of the auditor for the commission, defendant gave a copy of the agreement to him and it was included in his audit. This testimony of defendant is not denied, nor in any manner refuted.

Defendant's Exhibit no. 1 was offered in evidence and, on objection by counsel for the commission, it was excluded. Despite its rejection, it is this agreement that the commission determined was "a method or device for the purpose of buying milk at a price less

than the minimum price applicable to the particular transaction by a discount or rebate". Likewise, the commission fixed a price on the skim milk involved in this rejected agreement by calling a witness to the stand and qualifying him as an expert; this in the face of the asserted position of the commission and its counsel, and correctly so, that under the law prices are required to be fixed by official general order, and by the admissions in the record, the commission had not assumed any jurisdiction as to skim milk for animal feed and had promulgated no general order fixing the price thereof. Clearly what was done in that regard in this proceeding was erroneous. Beyond this, it is our opinion that the agreement, defendant's Exhibit no. 1, should have been received in evidence as a circumstance tending to show defendant's good faith in pursuing that course of action after consultation with the commission.

It is our further opinion that the record discloses other errors in the rejection of offers of proof favorably affecting the general contention of the defendant.

We turn now to a more particular consideration of the legal phase of the case. Insofar as the authority and duty of a court in an appeal of this character is subject to legislative control, that is found in section 906, article IX, of the Milk Control Law of April 28, 1937, P. L. 417, 31 PS §700*j*-906, which provides as follows:

"In an appeal from an order or decision of the commission applying only to the particular person or persons named therein, the case shall be heard upon the record certified to the court by the commission. Additional testimony shall not be taken before the court, but the court may, in proper cases, remit the record to the commission for the taking of further testimony.

"Upon any appeal the court shall determine whether or not the order appealed from is reasonable and in conformity with law. The appellant shall have the burden of proving that an order of the commission is unreasonable or illegal. If the court shall determine that the order is unreasonable or illegal, it shall remit the case to the commission with directions to reform the findings or order, or to revoke the order, in accordance with the court's opinion".

Counsel for the commission argue that the province of the court is similar to that in workmen's compensation cases. We recognize the well-established rule of the appellate courts of Pennsylvania in such cases that the compensation authorities are the fact-finding agency and the court, on appeal, is limited to a determination of two questions—whether there is sufficient competent evidence in the record to sustain the findings of fact and whether or not the law has been correctly applied; we cannot agree, however, that our review in this case may be dictated by that rule. The very statute involved has outlined the duties of the court wherein it states (see supra) ". . . the *court shall determine* whether or not the order appealed from is *reasonable* and *in conformity with law*", and directs the course to be followed "If the court shall determine that the order is *unreasonable* or *illegal*". (Italics supplied.) So that granting that the commission is the fact-finding agency and we are not permitted to take additional testimony, nevertheless, under the law, it is the province of this court to determine whether the order appealed from is "unreasonable", or "illegal", or both, and to then make an appropriate decree under the law, based upon that conclusion. We believe the requirement upon the court to determine the reasonableness of an order of the commission from which an appeal has been taken had its origin in the recognition by the legislature of the broad

authority vested in the commission—a concentration in one agency of government of the combined powers that normally are possessed by three separate and distinct branches of government, legislative, executive and judicial. The commission form of government is so fraught with potential dangers to the rights and liberties of its subjects through capricious or oppressive action that it is not surprising that the question of the illegality or unreasonableness of its orders should be made the subject of inquiry by the judiciary.

It appears that the real basis upon which the commission reached its ultimate conclusion in this case is in its determination that the skim milk agreement, supra, (offered as defendant's Exhibit no. 1), was a *"method* or *device* for the *purpose* of buying milk at a price less than the minimum price applicable to the particular transaction by a discount or rebate". (Italics supplied.) A "device", according to standard dictionaries, is "that which is devised, or formed by design; a scheme; often, a scheme to deceive; a stratagem; an artifice"; and when applied to an effort to allegedly violate a law or required duty, the term "method" would have a very similar meaning. In passing, we think it worthy of note that as to this alleged use of a "method" or "device" charged to defendant, there is a complete absence of the element of secrecy or stealth that normally accompanies such action. The commission found that defendant's "purpose", implying a deliberate design, was to buy milk at a price less than applicable to a particular transaction "by a discount or rebate". We think this a thoroughly unwarranted finding or conclusion under the admitted and undenied evidence in the record; the end to be sought by the agreement, giving consideration to the admitted circumstances under which it was entered into, was to provide a reasonable sum to cover the transportation costs of the milk purchased by de-

fendant from his producers. Furthermore, and of basic importance, it must be kept in mind that this particular agreement which the commission has determined was a "method" or "device" for an alleged illegal "purpose" on defendant's part, was entered into by defendant with his producers only after he was informed by both members of the commission that it would be satisfactory if "affable" (so spelled in the record) with said producers. Defendant openly so testified in the hearing and there is no denial of his testimony in this regard.

It is our honest belief that any fair-minded person, after an examination of the record in this case, would be required to conclude that defendant had not only made every reasonable effort to honestly comply with the law as laid down in the orders, rules and regulations of the commission, but also, before adopting any course of action, to determine whether it had the sanction of the commission. There should be, and we believe there is, a recognized principle of law that where one acts in entire good faith with an agency of government and in a manner approved of by it, he should not be penalized for such conduct by the forfeiture of valuable property rights at the hands of the agency with which he has so dealt. Forfeiture should be a punishment for fault which has produced a wrong. Surely it cannot be successfully contended that the conduct of defendant has thwarted or subverted the purpose of the Milk Control Law whose legislative purpose, as stated in 31 PS §700j-101, is as follows:

". . . it is hereby declared that this act shall be and is hereby enacted for the purpose of regulating and controlling the milk industry in this Commonwealth, for the protection of the public health and welfare and for the prevention of fraud".

Defendant's action which is complained of by the commission did not adversely affect the public health

and welfare. He practiced no fraud on the public; nor on his producers, since they voluntarily entered into the agreement with full knowledge and in the belief that it was an equitable and fair course to follow; nor on the commission, for the reason that what he did was not only with the commission's knowledge, but also its approval.

A further point sought to be made by counsel for the commission is to the effect that defendant is here attempting to attack a general price order which is not subject to such collateral attack. Admitting that under the law as laid down by the appellate courts relief from a general order fixing the money price in milk in a given area must be by way of appeal in that proceeding, we do not agree that the contention of defendant here can be viewed as such attack. He is here claiming that his course of action was along lines approved of by the commission in dealing with the subject of the transportation costs of milk under peculiar conditions. That the commission, doubtless in the interest of equality, from time to time has made regulations concerning hauling charges is admitted in the brief, as heretofore pointed out, and is likewise established by the evidence as to the history of defendant's own operations under a recognized permit, and beyond that, defendant offered evidence, which was rejected, as to similar arrangements made by the commission with other milk dealers. In connection with this latter proffered and rejected evidence, the brief filed on behalf of the commission contains what we believe may be called rather startling statements, namely:

". . . If such a deduction (meaning handling or transportation costs) were allowed other dealers, it would be a matter that *may reflect* upon the *political standing of the Commissioners*, or its employees and *would not be a judicial defense*. . . . If the *Commis-*

*sion was biased* in recognizing transportation *charges not under a general order*, they would be a matter for *political attack against the Commissioners and not for a judicial defense in this particular case*". (Italics supplied.)

The primary question before us to be determined is, as we have heretofore indicated, whether the order of the commission is "unreasonable" or "illegal". Webster's Dictionary defines "unreasonable" as "not conformable to reason; irrational; beyond the bounds of reason or moderation, immoderate; exorbitant". We find this definition is substantially adopted in Words and Phrases, Permanent Edition, Vol. 43, p. 368. With all due respect to the Milk Control Commission as an agency of the State Government and with no disposition to usurp any of its recognized power and authority, but likewise having respect for the duty imposed upon this court, it is our considered judgment that the order of the commission, entered under the attendant facts and circumstances, is clearly unreasonable. Having so concluded, an order will be entered remitting the case to the commission, with directions to revoke the order, in accordance with this opinion.

### Order and Decree

And now, April 8, 1946, on due consideration, the court having determined that the order of the Milk Control Commission, dated October 30, 1945, revoking milk dealer's license no. 1205 issued to William M. Nicoson, trading as Marion Center Creamery for the year May 1, 1945, to April 30, 1946, inclusive, and his right to apply for a license for the year May 1, 1946, to April 30, 1947, inclusive, is unreasonable, it is ordered and directed that the case shall be remitted to the commission, and that the Milk Control Commission shall revoke said order, in accordance with the foregoing opinion of the court.